**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| **MARY SANCHEZ, o/b/o J.V., III,** | ) | **CASE NO. 3:10CV2484** |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **MAGISTRATE JUDGE GREG WHITE** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | **MEMORANDUM OPINION & ORDER** |

Plaintiff, Mary Sanchez ("Sanchez"), on behalf of her son, J.V., challenges the final decision of the Commissioner of Social Security, Michael J. Astrue ("Commissioner"), denying the claim for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act ("Act"), 42 U.S.C. § 1381, 20 C.F.R. § 416.924a.  This matter is before the Court pursuant to 42 U.S.C. § 405(g) and the consent of the parties entered under the authority of 28 U.S.C. § 636(c)(2).

For the reasons set forth below, the decision of the Commissioner is vacated and the case remanded for further proceedings consistent with this Order.

## I.  Procedural History

On August 3, 2005, Sanchez, through counsel, filed an application for SSI benefits on behalf of J.V., at the time a school-age child, but an adolescent at the time of the hearing, due to third-degree burns and affective disorders.  (Tr. 33, 34.)  The application was denied both initially and upon reconsideration.  Sanchez timely requested an administrative hearing.

On June 12, 2009, a hearing was held before an Administrative Law Judge ("ALJ").  J.V. was represented by counsel.  On July 27, 2009, the ALJ found that J.V. did not have an impairment or combination of impairments that met, medically equaled, or functionally equaled an impairment listed in Appendix 1.  He concluded, therefore, that J.V. was not under a disability.  (Tr. 25.)

**II.  Evidence**

J.V. was born in 1993 and was fifteen years old at the time of the hearing.  (Tr. 489.)

On July 29, 2005, J.V. suffered significant third-degree burns to his face, chest, abdomen, arms, hands, palms, fingers, and right lower leg after gasoline was accidentally ignited by a campfire.  (Tr. 181.)  He was admitted to the burn unit at St. Vincent Mercy Hospital where he was resuscitated and ultimately stabilized with the use of a ventilator.  *Id*. He was then transferred to the burn unit of the Shriners Hospital for Children.  *Id*.

At the Shriners Hospital, J.V. underwent six skin graft surgeries between August 1, 2005 and August 15, 2005.  (Tr. 205-208, 213- 227.)  He was discharged on September 2, 2005, with instructions to participate "in essentially regular activity" and to continue wearing pressure garments.  (Tr. 208.)  Over the next several months, J.V. participated in outpatient occupational and physical therapy.  (Tr. 240-274.)

Initial progress notes from Shriners' Hospital indicate that J.V. was uncooperative with the home therapy portion of his convalescence, and, therefore, was referred to counseling.  (Tr. 326.)  On evaluation at Pathways Mental Health in November, 2005, J.V. reported problems adjusting to treatment and scarring, as well as problems with his father and court-enforced visitation.  (Tr. 379.)  J.V. was diagnosed with an adjustment reaction with mixed emotional features and assigned a global assessment of functioning ("GAF") score of 70.[1]  (Tr. 380-381.) J.V. was counseled at Pathways through April, 2006.  (Tr. 383-391.)  Progress notes documented a focus on adjustment to the burn trauma as well as ongoing issues with his father. *Id*.

In December, 2005, because of the physical/health needs related to his burns, J.V. then in the sixth grade, was referred to a school evaluation team to address specific educational

---

[1]The GAF scale reports a clinician's assessment of an individual's overall level of functioning.  Diagnostic & Statistical Manual of Mental Disorders, 30-31 (4th ed. 2000) ("DSM-IV").  An individual's GAF is rated between 0-100, with lower numbers indicating more severe mental impairments.  A GAF score of 70 (61-70 inclusive) is indicative of mild impairment. DSM-IV, 34 (4th ed. 2000).

concerns and J.V.'s need for special education services. (Tr. 76-114.) The evaluation, completed by his language arts teacher and school principal, noted that J.V. did not work well on his own and chose not to complete assignments, but he had no problems interacting and relating with others. (Tr. 116, 118, 122.) J.V. repeated the sixth grade due to numerous absences to attend therapy treatment for his burns. (Tr. 112, 355.) By the 2006-2007 school year, J.V.'s grades showed "C's" to "F's" in most of his academic courses.[2] (Tr. 124.) He was promoted to seventh grade, but his teacher noted that J.V. needed to improve his attitude toward school. (Tr. 123.)

Additionally, in December, 2005, consultative psychologist Albert Virgil, Ph.D., J.D., examined J.V. Dr. Virgil noted that J.V. exhibited a mildly depressed mood. (Tr. 230-233.) He opined that J.V.'s: (a) cognition, communication, and socialization were estimated to be three-fourths of the normal age appropriate level; and, (b) concentration, persistence, and pace in task completion and personal/behavioral patterns were estimated to be two-thirds of the normal age appropriate level. (Tr. 232.) He was assessed a GAF score of 55.[3] (Tr. 233.)

In February, 2006, Malika Haque, M.D., completed a Childhood Disability Evaluation Form indicating that J.V. had severe impairments of second and third-degree burns, adjustment disorder, and a learning disability, but found that such impairments did not meet, medically equal, or functionally equal a Listing. (Tr. 234-235.) Dr. Haque found J.V. to have marked limitations in "moving about and manipulating objects" and less than marked in the remaining five domains. (Tr. 234-239.)

By April, 2006, follow-up treatment showed that J.V.'s body scars had matured nicely and he no longer required pressure garments, though he did need to continue wearing a face mask. (Tr. 276.) He was also scheduled for laser treatments to the scars on his face and right

[2]The report card indicates he attended St. Augustine School for the 2006-2007 school year. Prior to that, J.V. attended Leipsic Elementary. (Tr. 115.)

[3]A GAF score of 51-60 indicates moderate symptoms (e.g. flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). *See* DSM-IV, 33-34.

3

shoulder.  Laser surgery and sponge skin excision were performed on July 21, 2006.  (Tr. 307.)
In January, 2007, J.V. underwent required incisional releases (Z-plasties) of scar contractures
involving his neck, left hand, and right forearm, as well as an additional laser and sponge
treatment to his face.  (Tr. 293.)

In October, 2006, John L. Mormol, M.D., completed a second Childhood Disability
Evaluation Form, finding the same severe impairments as previously found by Dr. Haque, *i.e.*,
second and third-degree burns on J.V.'s upper body, an adjustment disorder, and a learning
disability.  (Tr. 281-286.)  Dr. Mormol, like Dr. Haque, found J.V. to have less than marked
limitations in five of the six domains.  (Tr. 285-286.)  He noted that J.V. showed improvement,
yet still indicated a marked limitation in "moving about and manipulating objects."  (Tr. 286.)

J.V. continued to see a therapist over the summer months.  In June, 2007, the therapist
reported that J.V. had been in and out of jail for a total of 28 days since January, 2007, and that
he was on "house arrest" for most of the summer.  (Tr. 432.)  The therapist noted J.V. showed
"little to no motivation to change his behaviors, only staying out of trouble [because] on house
arrest."  *Id*.  The therapist also noted that "he is friends with members of the local gang and will
probably hang out with them when he gets off house arrest, sees no reason to change his
friends."  *Id*.  Notes from the July, 2007, visit indicate that the therapist continued working with
J.V. on anger management and he seemed to make progress on understanding why his choice
of friends could be a problem.  (Tr. 428.)  In August, 2007, the therapist noted that J.V. "seems
more and more insightful about his anger," and that he will be starting eighth grade at an
alternative school where he would continue counseling.  (Tr. 424-425.)

In December, 2007, J.V. returned to Pathways for counseling to address his behavior.
(Tr. 351-364.)  He was on probation at the time and had been incarcerated for three days due to
unruly behavior.  (Tr. 356-357.)  Moreover, J.V. had been suspended several times from school
and refused to do what was asked of him.  (Tr. 359.)  The court referred him for counseling for
anger management.  (Tr. 362.)  On December 31, 2007, he was diagnosed with oppositional

defiance disorder and assigned a GAF score of 50.[4]  (Tr. 363-364.)

Progress notes from a therapy session on January 18, 2008, indicate that J.V.'s mood was "flat, teary at times" and his behavioral/functioning was "mouthy, surly."  (Tr. 351.)  His GAF score was 50 and he was diagnosed with oppositional defiant disorder.  (Tr. 363, 430.)

From April, 2008, through October, 2008, J.V. continued in counseling.  (Tr. 420-438.) His problems in school regarding his attitude and acting out persisted.  (Tr. 437.)  By May, 2008, his behavior warranted a school suspension.  (Tr. 435.)  He was caught hitting another student, he was argumentative, and not learning his lessons.  (Tr. 434.)  As a result, he had to appear in court.  *Id*.

On August 31, 2008, J.V. was arrested.  (Tr. 441.)  After being tasered by the police, he was seen in the emergency room for taser burns.  *Id*.

On September 19, 2008, J.V. underwent additional skin graft surgery to release scar contracture bands on his right wrist and axilla.  (Tr. 453-458.)  He was discharged on September 24, 2008.  (Tr. 458.)  At a follow-up appointment on October 8, 2008, the doctor reported that the wounds were "healing nicely."  (Tr. 459.)

The alternative school, Leipsic High School/Putnam County Alternative Opportunity Center, conducted another evaluation due to J.V.'s ongoing conflicts with peers, difficulty with compliance with adults, and possible emotional issues stemming from adjustment to the original burn issues.  (Tr. 396.)  A discipline tracking record for a two-week period in September, 2008, showed multiple behavioral issues, the need to redirect J.V.'s attention on multiple occasions due to high distractibility, and time-outs for issues regarding anger and disturbing other students.  (Tr. 402-403.)

After conducting a school evaluation for cognitive functioning in September, 2008, the school psychologist noted J.V. scored in the average range of intellectual functioning on the

---

[4]A GAF score of 50 (41-50 inclusive) indicates "Serious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."  *See* DSM-IV, 34.

Kaufman Brief Intelligence Test - 2nd edition.  (Tr. 405.)  Despite this average cognitive

functioning, the school psychologist noted that J.V. required a highly structured behavioral

program with clearly defined limits, noting as follows:

> Results of this evaluation place [J.V.] within a below average range for his age
> in terms of overall behavioral adjustment and control.  There is a significant
> level of consistency with previous observation data and with ongoing behavioral
> documentation.  In each case, [J.V.] is rated at or near an average range in
> showing fears or physical symptomology as criteria relative to his needs.  In
> interviews and through observation, [J.V.] shows an ability to learn near an
> average rate and lack of physical symptoms of fears associated with school
> problems.  However, he has shown consistent and marked difficulty with
> maintaining interpersonal relationships, displaying appropriate behaviors under
> normal circumstances and showing signs of unhappiness and depression. [J.V.]
> is seen as a pleasant and cooperative young man when under control and has
> occasionally shown a positive attitude for a period of time.  He sees himself as
> cooperative and compliant, in direct contrast to outside observation and
> documentation by his teachers and his mother.  His reactions to other students
> and adults often escalate into negative behaviors which have a severe adverse
> impact on his education and the education of his peers. [J.V.] requires small
> group instruction and structured behavioral expectations in order to be
> successful.  He tends to be defiant of authority, aggressive with peers and lacks
> a sense of responsibility for his actions.

(Tr. 407.)  On October 20, 2008, an Evaluation Team Report, signed by all interested parties,

including a teacher, school psychologist, guidance counselor and Sanchez, determined  J.V. to

have an emotional disability.  (Tr. 410.)  The report stated:

> *Basis for Eligibility Determination*:  According to current evaluation data,
> observations, classroom information and background review, [J.V.]
> demonstrates a significant behavioral condition that has been observed over a
> long period of time and to a marked degree, that adversely affects his
> educational performance.
>
> *Educational Needs*: [J.V.] needs to continue to participate in the regular
> education curriculum.  He is most successful in a highly structured environment
> which encourages improvement in behavioral control and consistent daily
> performance.  Individualized instruction and accommodations appropriate for
> his disability will be necessary for academic success.

*Id*.

A Pathway's counselor noted that J.V. appeared in court in October, 2008, charged with

resisting arrest, disorderly conduct, and assaulting an officer.  (Tr. 420.)  He further indicated

that J.V. was sentenced to the juvenile detention center for six to twelve months.  (Tr. 445.)

While at the juvenile center, J.V. reported to a physician that he is "going crazy there . . . has

difficulty going to sleep, talks to himself to go to sleep.  Judge is going to recommend

counseling." *Id*. The Pathway's counselor further noted that a physician at the center started J.V. on Prozac, 20 mg., *id*., and requested that J.V. be seen by a psychiatrist. (Tr. 444-445.)

At the request of the ALJ, pediatrician Charles Block, M.D., reviewed the file on January 21, 2009, and February 27, 2009.[5] (Tr. 463-470.) Dr. Block noted J.V. suffered from second and third degree burns and an adjustment disorder. (Tr. 465.) However, he did not think that J.V. met or medically equaled Listing 108.08 because the wounds healed and his mobility limitations were resolved in less than 12 months. (Tr. 467.) Dr. Block did not find any functional equivalence, noting there was a "less than marked" limitation in all domains. (Tr. 468-469.)

### Hearing Testimony

At the hearing on June 12, 2009, J.V. testified to the following:

- On October 26, 2008, he was incarcerated for counterfeiting and forgery through the juvenile justice system. (Tr. 490-491.) He had previous charges of "unruly" behavior. (Tr. 491.)

- His most recent skin graft surgery was in September, 2008. (Tr. 490.) As he grows, he expects to have more surgeries. (Tr . 491.)

- When he attended "regular" school, his grades were "D's" and he had been suspended maybe six or seven times. *Id*.

- His skin is sensitive and cuts easily. He is required to use special sun screen. (Tr. 495-496.)

Sanchez testified as follows:

- J.V. started to have behavioral problems in school after the accident. (Tr. 496.) "Kids were picking on him and he, more or less, didn't care anymore because of everything going on." (Tr. 492.)

- After starting on an individual education plan ("IEP"), his grades improved a little bit. (Tr. 492-493.)

- J.V. would be attending an alternative school in the fall. (Tr. 494.) He also would continue to get counseling in anger management. (Tr. 496.)

### III.  Standard for Disability

---

[5]Dr. Block's review dated February 27, 2009, included the addition of Exhibits 17F through 28F, or transcript from pages 440-462. (Tr. 463.)

To qualify for SSI benefits, an individual must demonstrate a disability as defined under the Act.  "An individual under the age of 18 shall be considered disabled . . . if that individual has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 1382c(a)(3)(C).

To determine whether a child is disabled, the regulations prescribe a three-step sequential evaluation process.  20 C.F.R. § 416.924(a).  At step one, a child must not be engaged in "substantial gainful activity."  20 C.F.R. § 416.924(b).  At step two, a child must suffer from a "severe impairment."  20 C.F.R. § 416.924(c).  At step three, disability will be found if a child has an impairment, or combination of impairments, that meets, medically equals or functionally equals an impairment listed in 20 C.F.R. § 404, Subpt. P, App'x 1; 20 C.F.R. § 416.924(d).

To determine whether a child's impairment functionally equals the listings, the Commissioner will assess the functional limitations caused by the impairment.  20 C.F.R. § 416.926a(a).  The Commissioner will consider how a child functions in six domains: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for [ ]self; and (6) health and physical well-being.  20 C.F.R. § 416.926a(b)(1)(i)-(vi).  If a child's impairment results in "marked" limitations in two domains, or an "extreme" limitation in one domain, the impairment functionally equals the listings and the child will be found disabled.  20 C.F.R. § 416.926a(d).  To receive SSI benefits, a child recipient must also meet certain income and resource limitations.  20 C.F.R. §§ 416.1100, 416.1201.

A "marked" limitation is one which seriously interferes with functioning.  20 C.F.R. § 416.926a(e)(2)(i).  "Marked" limitation means "more than moderate" but "less than extreme." 20 C.F.R. § 416.926a(e)(2)(i).

An "extreme" limitation is one that "interferes very seriously with [a child's] ability to independently initiate, sustain, or complete activities."  20 C.F.R. § 416.926a(e)(3)(i).  An

"extreme" limitation means "more than marked."  20 C.F.R. § 416.926a(e)(3)(i).

If an impairment is found to meet, or qualify as the medical or functional equivalent to a listed disability and the twelve-month durational requirement is satisfied, the claimant will be deemed disabled.  20 C.F.R. § 416.924(d)(1).

### IV.  Summary of Commissioner's Decision

The ALJ found J.V. established medically determinable severe impairments due to "status post 2005 second and third degree burns to 36 percent of his body, borderline intellectual functioning (a learning disorder) and a history of mild depression;" however, his impairments or combination of impairments did not meet or medically or functionally equal one of the listings.  (Tr. 12.)  The ALJ concluded that J.V. had not been under a disability at any time since August 3, 2005. (Tr. 18.)

### V.  Standard of Review

This Court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied.  *See Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983).  Substantial evidence has been defined as "[e]vidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance."  *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966); *see also Richardson v. Perales*, 402 U.S. 389 (1971).

The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001)(*citing Mullen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached."  *See Key v. Callahan*, 109 F.3d

270, 273 (6th Cir. 1997).")  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d at 545 (*citing Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must consider whether the proper legal standard was applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations or failure to provide the reviewing court with a sufficient basis to determine that the Commissioner applied the correct legal standards are grounds for reversal where such failure prejudices a claimant on the merits or deprives a claimant of a substantial right.  *See White v. Comm'r of Soc. Sec.*, 572 F.3d 272 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006).

## VI.  Analysis

Sanchez argues that the ALJ erred by failing to find (1) that J.V.'s condition did not meet or medically equal Listing 108.08 Burns; and, (2) any functional equivalence as the ALJ found a "less than marked" impairment in each of the six childhood domains.

### Listing 108.08

Under Listing 108.08, burns are defined as: "[b]urns, with extensive skin lesions that have lasted or can be expected to last for a continuous period of at least 12 months.  (See 108.00F)."  Section 108.00F discusses how burns are evaluated, as follows:

> Electrical, chemical, or thermal burns frequently affect other body systems; for example, musculoskeletal, special senses and speech, respiratory, cardiovascular, renal, neurological, or mental.  Consequently, we evaluate burns the way we evaluate other disorders that can affect the skin and other body systems, using the listing for the predominate feature of your impairment.  For example, if your soft tissue injuries are under continuing surgical management (as defined in 101.00M)[6], we will evaluate your impairment under 101.08.

---

[6]Section 101.00M states:

> Under continuing surgical management, as used in . . . 101.08, refers to surgical procedures and any other associated treatments related to the efforts directed toward the salvage or restoration of functional use of the affected parts.  It may include such factors as post-surgical procedures, surgical complications,

However, if your burns do not meet the requirements of 101.08 and you have extensive skin lesions that result in a very serious limitation (as defined in 108.00C1) that has lasted or can be expected to last for a continuous period of at least 12 months, we will evaluate them under 108.08.

Section108.00(D) discusses how the Commissioner assesses the severity of skin disorders that may affect the skin and other body systems.  Section 108.00(D)(4) notes that "facial disfigurement or other physical deformities may also have effects we evaluate under the mental disorders listings in 112.00, such as when they affect mood or social functioning."

Sanchez argues that the ALJ ignored evidence that J.V. will need continuing surgeries and, therefore, meets or medically equals Listing 108.08.  The Commissioner contends that the ALJ reasonably determined that J.V.'s burn injuries did not meet or equal the requisite criteria under the Listing.  (Doc. No. 18 at 7-11.)

The ALJ, relying on the report of the medical expert, Dr. Block, found that Listing 108.08 was not met or equaled:

In the present case, on January 21, 2009, Charles Block, M.D., a pediatric medical expert, responded to pre-hearing written interrogatories indicating that in 2005, the claimant sustained second and third degree burns of the upper torso, extremity and face (over 36% of his body) after a burn accident.  As a result, the claimant was treated with skin grafts and pressure bandages.  Immediately after the burn accident, the claimant developed an adjustment disorder that was treated with psychotherapy for a few months.  Dr. Block further indicated that although these burns were over 36 percent of his body, they healed within a few months of the accident and his mobility and range of motion limitations resolved in less than 12 months.  Last, Dr. Block opined that the claimant had a "less than marked" limitation in all six childhood domains.

The opinion of Dr. Block is adopted in this case.  Dr. Block is a Board-certified pediatrician, and is well qualified by reason of training and experience in reviewing an objective record and formulating an opinion as to medical severity.  Although Dr. Block is not the claimant's examining or treating physician, he has the knowledge, training and perspective not shared by the other physicians of record which could reasonably be expected to give him greater insight into the limitations imposed by the claimant's impairments.  He had access to the entire record.  Furthermore, as an expert witness before the Social Security Administration, he has knowledge of Social Security Administration's program and had access to all of the medical evidence of record when offering his opinion.  His opinion is also based on a greater longitudinal perspective of the claimant's condition.

---

infections, or other medical complications, related to illnesses, or related treatments that delay the child's attainment of maximum benefit from therapy. When burns are not under continuing surgical management, see 108.00F.

(Tr. 16.)

An impairment will be deemed medically equivalent to a listed impairment if the symptoms, signs and laboratory findings as shown in the medical evidence are at least equal in severity and duration to the listed impairment. *Land v. Sec'y of Health & Human Servs.*, 814 F.2d 241, 245 (6th Cir. 1986). "Generally, the opinion of a medical expert is required before a determination of medical equivalence is made." *Retka v. Comm'r of Soc. Sec.*, 1995 WL 697215, at *2 (6th Cir. Nov. 22, 1995) (20 C.F.R. § 416.926(b)). "The primary function of a medical expert is to explain, in terms that the ALJ, who is not a medical professional, may understand, the medical terms and findings contained in medical reports in complex cases." *Griffin v. Astrue*, 2009 WL 633043 *10 (S.D. Ohio Mar. 6, 2009). Whether to call such an expert to testify is generally left to the discretion of the ALJ, *see id.*, *quoting Haywood v. Sullivan*, 888 F.2d 1463, 1467–68 (5th Cir. 1989), and the Court may overturn the exercise of that discretion only if it appears that the use of a medical consultant was necessary--rather than simply helpful--in order to allow the ALJ to make a proper decision. *See Landsaw v. Sec'y of Health and Human Servs*, 803 F.2d 211, 214 (6th Cir. 1986), *quoting Turner v. Califano*, 563 F.2d 669, 671 (5th Cir. 1977).

The claimant bears the burden of bringing forth evidence to establish that he meets or equals a listed impairment. *Evans v. Sec'y of Health & Human Servs.*, 820 F.2d 161, 164 (6th Cir. 1987) (*per curiam*); *see also Landsaw v. Sec'y of Health & Human Servs.*, 803 F.2d 211, 214 (6th Cir. 1986) ("The burden of providing a . . . record . . . complete and detailed enough to enable the Secretary to make a disability determination[ ] rests with the claimant.").

Although there is evidence that J.V. will need more surgeries as he grows, there is no evidence that J.V. is under continuing surgical management as defined by 20 C.F.R. Pt. 404, Subpt. P, App. 1, at 1.00(M). Here, the evidence indicates that after J.V.'s September 2008 release surgery, he recuperated very quickly, and was back to school and his normal routine within a month. Therefore, even if J.V. requires subsequent release surgeries, the criteria of continued surgical management is not met here. Sanchez's first assignment of error is without merit.

12

**Functionally Equaling a Listing**

Sanchez also claims the finding that J.V.'s impairments did not functionally equal a listing is unsupported by substantial evidence. Sanchez contends that the decision ignores significant evidence documenting marked limitations in behavior, including attending and completing tasks, as well as in social functioning. (Doc. No. 15 at 12.) The Commissioner contends that the ALJ properly considered the record as a whole. (Doc. No. 18 at 13.)

The ALJ, giving great weight to Drs. Block and Virgil, concluded that J.V. has less than marked limitations in the six childhood domains of function:

> In summary, although it is most unfortunate that the claimant sustained severe burns over 36 percent of his body after a fire accident, he made a remarkable recovery in less than 12 months. He will require future surgeries as he matures and grow. Although his mother alleges that he stills struggles with some depression and anger, his treatment at the Pathway Counseling Center was brief and there are no records that support that he continues to receive any counseling from that facility any longer. He also has never been prescribed psychotropic medications.
>
> The opinion given by Dr. Block, the medical expert, is given the most weight in this case. Dr. Block is Board-certified and had the benefit of the longitudinal medical record when giving his opinion.
>
> The opinion given by Dr. Virgil, the consulting psychologist, is also given great weight in this case. Although Dr. Virgil is not the claimant's treating physician, he is a specialist in the field of psychology and conducted a thorough psychological evaluation of the claimant complete with psychological testing.
>
> The opinion given by Daniel VonderEmbse, the school psychologist, is also given some weight in this case and persuades the undersigned that during the most recent 2008/2009 school year, the claimant was adjusting in the school setting with some positive reinforcement.
>
> Social Security Ruling 96-6p explains that because State Agency physicians and psychologists are experts in Social Security disability programs, the rules in 20 CFR § 416.927(f) require Administrative Law Judges and the Appeals Council to consider as opinion evidence from nonexamining physicians and psychologists. Administrative Law Judges and the Appeals Council are not bound by findings made by State Agency or other program physicians and psychologists, but they may not ignore these opinions and must explain the weight given to the opinions in their decisions. The State Agency opinions in Exhibit 4F and 7F[7] are considered consistent with the medical evidence as a whole, only to the extent that their opinions support that the claimant does not have a "marked" limitation in two out of the six domains. However, the state

---

[7]Exhibits 4F and 7F are the Childhood Disability Evaluation Forms completed by Drs. Haque and Mormol in 2006. (Tr. 234-239, 281-286.)

agency physicians assessed a "marked" limitation in moving about and manipulating objects which is not consistent with the medical evidence as a whole.

After considering the evidence of record, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms; however, the statements concerning the intensity, persistence and limiting effects of the claimant's symptoms are not credible to the extent they are inconsistent with finding that the claimant does not have an impairment or combination of impairments that functionally equals the listings for the reasons explained below.

(Tr. 19-20.)

The ALJ proceeded to discuss each of the domains, finding J.V. to have less than marked limitations in each. The Court will focus on the two domains Sanchez disputes: attending and completing tasks and interacting and relating with others.

**Attending and Completing Tasks**

In the domain of attending and completing tasks, the Regulations require the Commissioner to consider how well a child is able to focus and maintain attention, and how well he is able to begin, carry through, and finish activities. 20 C.F.R. § 416.926a(h)(1). "It involves the ability to filter out distractions and to remain focused on an activity or task at a consistent level of performance." *Id.* The Regulations also provide age-specific functions for this domain as follows:

(iv) *School-age children (age 6 to attainment of age 12).* When you are of school age, you should be able to focus your attention in a variety of situations in order to follow directions, remember and organize your school materials, and complete classroom and homework assignments. You should be able to concentrate on details and not make careless mistakes in your work (beyond what would be expected in other children your age who do not have impairments). You should be able to change your activities or routines without distracting yourself or others, and stay on task and in place when appropriate. You should be able to sustain your attention well enough to participate in group sports, read by yourself, and complete family chores. You should also be able to complete a transition task (e.g., be ready for the school bus, change clothes after gym, change classrooms) without extra reminders and accommodation.

(v) *Adolescents (age 12 to attainment of age 18).* In your later years of school, you should be able to pay attention to increasingly longer presentations and discussions, maintain your concentration while reading textbooks, and independently plan and complete long-range academic projects. You should also be able to organize your materials and to plan your time in order to complete school tasks and assignments. In anticipation of entering the workplace, you should be able to maintain your attention on a task for extended periods of time, and not be unduly distracted by your peers or unduly distracting

14

to them in a school or work setting.

20 C.F.R. § 416.926a(h)(2)(iv),(v).  The Regulations provide examples of limited functioning:
"(iii) [claimant] repeatedly become side-tracked from [his] activities or [claimant] frequently
interrupt[s] others."  § 416.926a(h)(3)(iii).

### Interacting and Relating with Others

This domain considers how well a claimant is able to relate and sustain emotional
connections with others, cooperate with others, comply with rules, respond to criticism, and
respect and take care of the possessions of others.  20 C.F.R. § 416.926a(i).  The age-specific
functions are as follows:

> (iv) *School-age children (age 6 to attainment of age 12)*.  When you enter
> school, you should be able to develop more lasting friendships with children
> who are your age.  You should begin to understand how to work in groups to
> create projects and solve problems.  You should have an increasing ability to
> understand another's point of view and to tolerate differences.  You should be
> well able to talk to people of all ages, to share ideas, tell stories, and to speak in
> a manner that both familiar and unfamiliar listeners readily understand.

> (v) *Adolescents (age 12 to attainment of age 18)*.  By the time you reach
> adolescence, you should be able to initiate and develop friendships with children
> who are your age and to relate appropriately to other children and adults, both
> individually and in groups.  You should begin to be able to solve conflicts
> between yourself and peers or family members or adults outside your family.
> You should recognize that there are different social rules for you and your
> friends and for acquaintances or adults.  You should be able to intelligibly
> express your feelings, ask for assistance in getting your needs met, seek
> information, describe events, and tell stories, in all kinds of environments (e.g.,
> home, classroom, sports, extra-curricular activities, or part-time job), and with
> all types of people (e.g., parents, siblings, friends, classmates, teachers,
> employers, and strangers).

20 C.F.R. § 416.926a(I)(2)(iv),(v)

The Regulations further indicate that the Commissioner is to consider "all of the
relevant information in [the] case record" in deciding whether a medically determinable
impairment(s) results in a "marked" or "extreme" limitation.  §§ 416.926a(h)(3);
416.926a(i)(h)(3).

The ALJ concluded that J.V. has less than marked limitation in attending and
completing tasks, as follows:

> At the psychological evaluation conducted by Dr. Virgil in December 2005, Dr.
> Virgil assessed that the claimant was functioning two-thirds of his appropriate

15

level and had adequate working memory issues.  In September 2008, Dr.
VonderEmbse, the school psychologist, assessed that the claimant was able to
respond appropriately to tasks required with consistent effort and minimal
distractibility.  Overall, the psychologist opined that the claimant was able to
demonstrate average cognitive skills, reasoning and learning potential for his
age.  His rate of learning and expectation for school-related achievement was
also within an average range in most areas (Exhibit 15F).

(Tr. 22.)

The ALJ also found that J.V. had less than marked limitations in interacting and relating

with others, noting as follows:

At the psychological consultative evaluation conducted by Dr. Virgil in
December 2005, the doctor assessed that the claimant could socially interact at
three-fourths the age appropriate level with no significant behavioral
abnormalities.

The record contains only vague reports of depression with only brief
psychotherapy treatment immediately after his burn accident.  There are no
reports in the record indicating any mental health treatment for social
interactions since December 2005.  Although the claimant had more severe
problems interacting with his mother immediately after the accident, the
evidence supports that the claimant's interpersonal behavior has improved since
being accepted to Putnam Alternative School.  They are addressing his
behavioral problems.

(Tr. 23.)

The ALJ relied on Dr. Virgil's December, 2005, opinion, but the ALJ should also have

considered  J.V.'s counseling and school records.  The ALJ mentioned the school psychologist,

Dr. VonderEmbse's, 2008 report, but only referenced the positive points and not the fact that

on October 20, 2008, Dr. VonderEmbse concluded that J.V. demonstrated "marked difficulty"

with maintaining interpersonal relationships as follows:

Results of this evaluation place [JV] within a below average range for his age in
terms of overall behavioral adjustment and control.  There is a significant level
of consistency with previous observation data and with ongoing behavioral
documentation.  In each case, [JV] is rated at or near an average range in
showing fears or physical symptomology as criteria relative to his needs.  In
interviews and through observation, [JV] shows an ability to learn near an
average rate and lack of physical symptoms of fears associated with school
problems.  However, he has shown consistent and marked difficulty with
maintaining interpersonal relationships, displaying appropriate behaviors under
normal circumstances and showing signs of unhappiness and depression. [JV] is
seen as a pleasant and cooperative young man when under control and has
occasionally shown a positive attitude for a period of time.  He sees himself as
cooperative and compliant, in direct contrast to outside observation and
documentation by his teachers and his mother.  His reactions to other students
and adults often escalate into negative behaviors which have a severe adverse

16

impact on his education and the education of his peers. [JV] requires small
group instruction and structured behavioral expectations in order to be
successful.  He tends to be defiant of authority, aggressive with peers and lacks
a sense of responsibility for his actions.

(Tr. 407.)  Furthermore, a School Evaluation Team Report, dated October 20, 2008, signed by

all interested parties, including the parent, a teacher, school psychologist and guidance

counselor, concluded that J.V. had an emotional disability.  (Tr. 410.)  This report states:

> *Basis for Eligibility Determination*:  According to current evaluation data,
> observations, classroom information and background review, [JV] demonstrates
> a significant behavioral condition that has been observed over a long period of
> time and to a **marked** degree, that adversely affects his educational
> performance.
>
> *Educational Needs*: [JV] needs to continue to participate in the regular
> education curriculum.  He is most successful in a highly structured environment
> which encourages improvement in behavioral control and consistent daily
> performance.  Individualized instruction and accommodations appropriate for
> his disability will be necessary for academic success.

*Id.* (emphasis added).

The Team Report also describes J.V.'s emotional disturbance as follows:

* * *

> 2.      An inability to build or maintain satisfactory interpersonal relationships
>            with peers or teachers:
>            ■ Over a long period of time
>            ■ To a marked degree
>            ■ Adversely affects educational performance
>            Explain: Lack of consistent social skills, negative behavior with peers
>
> 3.      Inappropriate types of behavior or feelings under normal circumstances:
>            ■ Over a long period of time
>            ■ To a marked degree
>            ■ Adversely affects educational performance
>            Explain: Difficulty with compliance at home and at school

* * *

(Tr. 409.)  The School Team Evaluation, including Dr. VonderEmbse's report, would support

J.V. having difficulty in attending and completing tasks.  In addition, the team report noted that

J.V. displayed inappropriate behavior or feelings under normal circumstances as well as an

inability to build or maintain satisfactory interpersonal relationships with peers or teachers,

both to "a marked degree."  (Tr. 409.)  The ALJ provides no analysis of the school

administration's assessment regarding J.V.'s impairments, or reasons why the ALJ discounted

17

or rejected these opinions. As school records must be considered by the ALJ in determining whether a child claimant is disabled, the ALJ should have considered the school psychologist's full report and explained the reason why he discounted any portion of it. For these reasons, the Court finds that the ALJ's decision does not comply with the relevant legal standards.

Sanchez, on behalf of J.V., can be awarded benefits only if proof of J.V.'s disability is "compelling." *Facer v. Sec'y of Health & Human Services*, 17 F.3d 171, 176 (6th Cir. 1994) (the court can reverse the Commissioner's decision and award benefits only if all essential factual issues have been resolved and proof of disability is compelling). When the ALJ misapplies the regulations or when there is not substantial evidence to support one of the ALJ's factual findings and his decision therefore must be reversed, the appropriate remedy is not to award benefits. The case can be remanded for further consideration.

The Court remands this matter for further factual findings and analysis in accordance with the cited regulations.

### VII. Decision

For the foregoing reasons, the decision of the Commissioner is vacated and the case remanded, pursuant to 42 U.S.C. § 405(g) sentence four,[8] for further proceedings consistent with this Order.

IT IS SO ORDERED.

    s/ Greg White_____
United States Magistrate Judge

Date:  __December 15, 2011____

---

[8]Under sentence four of 42 U.S.C. § 405(g), the district court has the authority to reverse, modify, or affirm the decision of the Commissioner. This may include a remand of the case back to the Commissioner for further analysis and a new decision. A sentence four remand is a final judgment. *See Melkonyan v. Sullivan*, 501 U.S. 89, 97-102, 111 S.Ct. 2157, 115 L.Ed.2d 78 (1991).